-AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

## DISTRICT OF DELAWARE

| In the Matter of the Search of | APPLICATION AND AFFIDAVIT |
|---|---|
| (Name, address or brief description of person, property or premises to be searched) | FOR SEARCH WARRANT |

Bear, DE 19701,
as described more particularly in Attachment A

CASE NUMBER: 06- 42m

**REDACTED**

I, __Antonino Lo Piccolo_____ being duly sworn depose and say:

I am a(n) __Special Agent, IRS_____ and have reason to believe

that ___ on the person of or __X__ on the property or premises known as (name, description and/or location)

220 N. Antlers Place, Bear, DE 19701, as described more particularly in Attachment A

in the _____ District of __Delaware_____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE ATTACHMENT B

which are (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure)

evidence, fruits and/or instrumentalities of a crime

concerning a violation of Title __18__ United States Code, Section(s) _1344 and 1028A_____.
The facts to support a finding of Probable Cause are as follows:

See attached Affidavit

Continued on the attached sheet and made a part hereof.    __X__ Yes    ___ No

APR 1 3 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Signature of Affiant
Antonino Lo Piccolo
Special Agent, IRS

Sworn to before me, and subscribed in my presence

__April 11, 2006__ at   Wilmington, Delaware
Date                         City and State

The Honorable Kent A. Jordan
U.S. District Court Judge for the District of Delaware
Name and Title of Judicial Officer                Signature of Judicial Officer

**REDACTED**

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Antonino Lo Piccolo, a Special Agent for the Internal Revenue Service, being duly sworn, depose and state:

1. I am employed as a Special Agent (S/A) for the Internal Revenue Service (IRS), Criminal Investigation, and have been since August 19th, 2004. I received a Bachelor's of Science in Accounting from the Pennsylvania State University in 1999, and passed the Certified Public Accountant Examination in 2003. Prior to becoming an S/A, I was an accountant for a nine billion dollar Fortune 500 company, and an auditor for Medicare. I am currently assigned to the Baltimore Field Office, Wilmington, Delaware post of duty. My duties as a S/A are to investigate criminal violations of the Internal Revenue Code (IRC), enumerated as Title 26, and various Sections of Title 18, and Title 31.

2. I graduated from the Federal Law Enforcement Training Center (FLETC) on February 11, 2005. There I received instruction on investigative techniques and searches and seizures. I have been trained in the execution of financial search warrants resulting in the seizure of financial documents, United States currency, and tax-related documents.

3. This affidavit is submitted in support of an application for a search warrant for the residence of Richard Yaw Adjei,          ,          , Bear, DE 19701, which I have probable cause to believe contains the items set forth in Attachment B hereto, such items constituting evidence of violations of Title 18, United States Code, Sections 1344 and 1028A, and related statutes.

4. I have been personally involved in the investigation of Richard Yaw Adjei. Based on the information outlined in this affidavit, as well as my training and experience, and discussions with other experienced Special Agents, it is your affiant's belief that Richard Yaw Adjei has violated Internal Revenue laws by filing false and fictitious Federal income tax returns requesting refunds using the identities of other individuals without their permission and has received loans from financial institutions based on these false and fraudulent returns. Unless otherwise stated, the information in this affidavit is either personally known to your affiant or has been provided by other law enforcement officers or employees of the Internal Revenue Service and/or has been learned through the review of various documentation and records more particularly described herein.

### ERO, EFIN, Transmitter, RAL, & IP Address Defined

5. E-File is the automated electronic filing system created by the Internal Revenue Service (IRS). In order to electronically file tax returns with the IRS, a return preparer must complete an application process to become an authorized electronic filer of income tax returns. The requesting party must complete and submit Form

1

8633, Application to Participate, in the IRS E-File Program. Upon approval of the application, the requestor becomes an Electronic Return Originator ("ERO") and is assigned an Electronic Filing Identification Number ("EFIN") which the IRS uses to identify and monitor ERO activity. With the use of a computer, tax software, and an Internet connection, the ERO can submit tax returns to the IRS through a "Transmitter." A Transmitter is a person or entity that transmits electronic tax return information directly to the IRS. A Transmitter sells software to EROs that enables EROs to submit returns via the Transmitter to the IRS.

6. A refund anticipation loan (RAL) is a short term loan that a financial institution extends for a fee to a person anticipating a tax refund. A person will typically apply for a RAL when filing a tax return electronically through an ERO. The person, on their tax return, directs the IRS to pay their anticipated refund over to the financial institution. The financial institution approves a loan payment to the person in the form of a check, direct deposit, or stored value card. The loan is for the amount of the refund due the taxpayer less the financial institution's and ERO's fees. The loan payment is typically distributed to the taxpayer through the ERO (i.e. the ERO hands the taxpayer a stored value card or cashier's check). A stored value card is loaded by the financial institution with a pre-paid amount equal to the RAL amount and can be used to make debit transactions, such as using the card to withdrawal cash from ATM machines. RALs are repaid when the IRS transfers the refund proceeds to the financial institution.

7. Each simultaneous Internet connection is assigned a unique Internet Protocol (IP) address. Ranges of IP addresses have been assigned to Internet Service Providers (ISP). When an ISP customer logs onto the Internet, a unique IP address is assigned to the customer for as long as they remain connected to the Internet. Connection Logs are kept in the normal course of business by ISPs. The Connection Logs identify the user assigned an IP address on a particular day and at a specific time. Providing the IP address, date, time, and time zone to the ISP allows for the identification of the ISP's customer.

## SUMMARY

8. My investigation has determined that Richard Yaw Adjei, a.k.a. Johnson Agyeman, of           , Bear, DE 19701 has been preparing and electronically filing fraudulent Federal income tax returns using the social security numbers of other individuals without their knowledge. Between January and March 2006, the IRS received 120 returns seeking a total of at least $347,145 in fraudulent refunds from an ERO named Auskwat Services. Based on my investigation, I believe that Adjei used the EFIN assigned to Auskwat Services and a computer to electronically file fraudulent returns with the IRS. Adjei used these fraudulent refund claims to secure RALs from HSBC Bank, JP Morgan Chase (Bank One), and Santa Barbara Bank & Trust (SBB&T), federally insured financial institutions. Adjei deposited loan proceeds, in the form of cashier's checks, into three of bank accounts under his control. Adjei also made cash withdrawals at ATM machines using stored value

2

cards which were loaded with RAL funds by HSBC as a result of fraudulent returns filed by Adjei.

### Analysis of Returns and Other Information Filed with IRS

9. On August 8, 2005, the IRS received a Form 8633, "Application to participate in the IRS E-File Program", from an electronic return preparer named Auskwat Services. The application was signed by a Micah Bruce as President, and listed Bruce's address as                    , Apt. 5204, Dallas, TX 75287. The IRS approved the application and assigned an EFIN of 755160, thus permitting Auskwat Services to submit electronic returns to the IRS.

10. Based on information received from the IRS's Philadelphia Fraud Detection Center (FDC), Auskwat Services (EFIN 755160) filed 120 returns for the 2005 tax year. These returns were transmitted to the IRS through a transmitter called Universal Tax Systems. The total refunds claimed amounted to $347,145. Your affiant examined the return information provided by the FDC and identified the following similarities:
    - 114 of 120 returns included a Schedule C Profit or Loss From Business;
    - Head of Household filing status was used on returns;
    - Two foster children were claimed on each return;
    - Earned Income Credit of at least $4,000 was claimed on each return;
    - 108 of 120 returns had refund claims of between $2,700 and $2,728;
    - Sixteen returns used a variation of          Lane, Bear, DE for the taxpayer's address (located in same complex as           Place);
    - Twenty-four returns used a variation of          Blvd. (plus unit #), Newark, DE for the taxpayer's address (located less than six miles from          Place);
    - 129 Charles Arbors Lane, New Castle, DE 19721 was used six times as a taxpayer's address;
    - Remaining taxpayer addresses were in New Castle County, DE or the Bronx, New York;
    - Sixty-six taxpayers applied to HSBC for RALs;
    - Thirty-two taxpayers applied to JP Morgan Chase for RALs; and
    - Twenty-two taxpayers applied to SBB&T for RALs

11. On March 22nd, 2006, your affiant drove by          Lane, Bear, DE and          Blvd., Newark, DE and found each address to be a single-unit townhome, and not a multiunit building.

12. A representative of the United States Postal Inspection Service informed your affiant that 129 Charles Arbors Lane, New Castle, DE is not a valid address.

13. Based on public records and prior year IRS records, all taxpayers, except for three, who had tax returns filed by Auskwat Services live in Wisconsin, Illinois, South Dakota, Iowa, or Minnesota. None live in Delaware or New York.

### Taxpayer Interviews and W-2 Wage Verifications

3

14. Auskwat Services filed an electronic return in the name of D    M    with IRS and HSBC on January 16th, 2006. On March 20th, 2006, IRS-CI Special Agent Jesse Leming interviewed D    M    of Hubertus, WI. D    M    stated that he self-prepared his 2005 Form 1040 Individual Income Tax Return, which he filed jointly with his wife, and mailed it to the IRS on February 07th, 2006. M    has never lived in Delaware or New York and does not have any foster children. M    has never used Auskwat Services, and has never heard of a refund anticipation loan. M    confirmed that his name and social security number were used without his permission by Auskwat Services.

15. Auskwat Services filed an electronic return in the name of J    P    with IRS and HSBC on January 16th, 2006. On March 20, 2006, S/A Leming interviewed J    P    of Milwaukee, WI. P    stated that he has used the same tax preparer since approximately 1984, and that he has not yet filed his 2005 Form 1040 Individual Tax Return. P    has never lived in Delaware or New York. P    has never used the head of household filing status, has no foster children, and has never heard of Auskwat Services or of a refund anticipation loan. P    confirmed his name and social security number were used without his permission by Auskwat Services.

16. Auskwat Services filed an electronic return in the name of O    P    , Jr. with IRS and HSBC on February 4th, 2006. On March 20, 2006, S/A Leming interviewed O    P    of Milwaukee, WI. P    stated that he has lived in Wisconsin his entire life, and has no foster children. P    had his 2005 tax return prepared by a tax preparer in Milwaukee, Wisconsin during the second week of February, 2005. P    has never heard of Auskwat Services, and he has never applied for a refund anticipation loan. P    confirmed his name and social security number were used without his permission by Auskwat Services.

17. Auskwat Services filed an electronic return in the name of Jane O    with IRS and HSBC on January 15th, 2006. On March 21st, 2006, John O    informed S/A Leming that his wife, Jane O    , died on December 24th, 2005.

18. S/A Leming interviewed six other taxpayers whose names and social security numbers were used by Auskwat Services to file returns with IRS and HSBC. All six taxpayers stated that they have no foster children, have never heard of Auskwat Services, and that their personal information was used without their permission.

19. Auskwat Services included Wage and Earning Statement (Form W-2) information on returns filed for six taxpayers. The W-2s reflected wages allegedly received by these taxpayers from employers with New York addresses. Each alleged employer was asked by IRS personnel to verify the employment of the taxpayer, who according to the W-2s filed by Auskwat Services, had worked for them in 2005. Five of the alleged employers responded that they possess no record of the taxpayer

4

whose employment they were asked to verify. The sixth alleged employer has not responded as of 04/10/2006.

### RAL Bank Records and Links to Adjei

20. EFIN 755160 was used by an ERO to enroll in HSBC Bank's RAL program. HSBC provided the following information relative to this EFIN:

    - Owner's Name & Address: Mike Bruce,           Pkwy Dallas, TX 75287;
    - Business Name: Auskwat Services;
    - Address:           Place, Bear, DE 19701;
    - Phone : (917) 250-   ;
    - Fax: (302) 838-   ;
    - Email address: kelvinatorj@aol.com;
    - Bank Account: Wilmington Savings Fund Society #      ; and
    - Name on Account: Richard Adjei

21. On March 20th, 2006 a representative of the United States Postal Inspection Service informed your affiant that Richard Adjei is receiving mail at           Place, Bear, DE 19701.

22. Your affiant searched AT&T's AnyWho Internet Directory Assistance and found a listing for phone number (302) 838-    at           Place, DE 19701.

23. Adjei's Delaware Driver's License issued on 10/05/2005 shows Adjei's address to be           Place, Bear, DE 19701. According to DE Department of Motor Vehicles' records, Adjei registered a 1993 GEO Prizm with tag number       on 01/20/2006.

24. On March 10, 2006, your affiant drove by           Place and observed a GEO Prizm with tag number       parked outside. On March 16th at 8:50 PM, and on March 17th at 6:50 AM your affiant observed a GEO Prizm bearing tag number       parked outside of           Place. Adjei's residence is a single-unit townhouse located in a complex called        . Your affiant did not observe any signs or other indications of a tax return preparation business operating at this address.

25. Your affiant was advised by a HSBC representative that HSBC deducts the ERO's processing fees from the taxpayer's refund amount. HSBC direct deposited Auskwat Services' fees into account           at WSFS.

26. A WSFS representative verified that account       is held in the name of Richard Yaw Adjei. WSFS records list Adjei's address as           Place, Bear, DE 19701, and his phone number as (302) 838-   .

27. Between January 10th, 2006, and March 6th, 2006, HSBC received sixty-six returns and corresponding RAL applications from Auskwat Services. The total refunds

5

sought amounted to $183,051. HSBC relied on the returns to approve twenty-one RALs in the form of stored value cards and twenty-six RALs in the form of cashier's checks. The remaining nineteen loans were cancelled by HSBC prior to being approved for release due to suspicions of fraud.

28. On 01/12/2006 and 02/13/2006, HSBC mailed stored value cards to Auskwat Services at             Place, Bear, DE 19701. Twenty-one of these cards were loaded with RAL funds. HSBC provided a detailed transaction history showing the usage of each card. Your affiant examined the transaction detail and found that fifteen cards were used to withdraw cash from ATMs at locations in New Castle County, Delaware. Five other cards were used to withdraw cash from ATMs at locations in the Bronx, New York, and the remaining card has not been used as of 03/17/2006. None of the taxpayers who should have received these cards live in Delaware or New York.

29. Between January 13th, 2006, and February 4th, 2006, JP Morgan Chase (Bank One) received thirty-two returns sent by Auskwat Services using EFIN 755160. The total amount of refunds claimed on these returns amounted to $87,046. JP Morgan Chase (Bank One) allowed Auskwat Services to print Bank One cashier's checks for payment of RALs. Auskwat Services' processing fees were direct deposited to WSFS account number         held in the name of Richard Yaw Adjei.

30. Between January 19th and January 21st, 2006, SBB&T received twenty-two returns from EFIN 755160. SBB&T records reflect the following information pertaining to this EFIN:
    - Owner: Mike Bruce;
    - Name: Auskwat Services;
    - Address:          Place;
    - Phone: (917) 250-    ; and
    - Bank Account:       (routing # belonging to WSFS)

31. A SBB&T representative advised your affiant that on December 27th, 2005, SBB&T mailed thirteen packages containing blank check stock to           Place. SBB&T authorized Auskwat Services to print nineteen SBB&T cashier's checks based on returns filed by Auskwat Services and accepted by the IRS. As of March 28th, 2006, three additional checks were on hold pending notification of acceptance of the related tax returns by the IRS.

32. A Wilmington Trust representative advised your affiant that a SBB&T cashier's check was deposited into a bank account belonging to Richard Yaw Adjei. Your affiant viewed photographs taken from Wilmington Trust bank surveillance film, and compared these photographs to Adjei's DE driver's license photo. Your affiant believes that Richard Adjei is the person photographed depositing the SBB&T cashier's check into his account. Wilmington Trust records list Adjei's social security number (SSN) as      -1277 and his date of birth as         .

6

## PRIOR NAME AND EFIN #

33. On April 5th, 2006 a representative of the Social Security Administration, Office of Inspector General, informed your affiant that SSN      1277 was issued to a Johnson Agyeman on 10/07/1997. The SSA OIG representative also reported that a name change from Agyeman to Richard Yaw Adjei was filed on 10/24/2005.

34. A search for the SSN and date of birth combination of      -1277 and        on a law enforcement database returned a New York State driver's license and a New York City Police Department record under the name Johnson Agyeman. Your affiant viewed a photograph of Agyeman obtained from the NYPD and he appears to be the same man who is pictured in Adjei's DE driver's license photograph. His NY driver's license lists Agyeman's address as        Avenue, Apt 6G, Bronx, NY 10457.

35. A search of IRS EFIN records for SSN      -1277 revealed that EFIN 130168 was issued to a Johnson Agyeman in November of 2003. The application (Form 8633) for this EFIN lists the following information:
    - SSN:      -1277;
    - Name: Rydex Ventures;
    - Business Location:        Avenue #G Bronx, NY 10453;
    - Business Telephone: (718) 731-    ; and
    - Primary contact: Johnson Agyeman

36. A representative of IRS' Philadelphia Fraud Detection Center (FDC) advised your affiant that Rydex Ventures filed 184 returns for the 2004 tax year. The total refunds claimed amounted to $566,416. Your affiant examined the return information and found that most returns included a Schedule C Profit or Loss From Business and that two dependents were claimed on each return. The FDC further advised your affiant that some of the dependents claimed are deceased. These returns were identified as a possible fraud scheme by the IRS' Fraud Detection Center in New York.

## Bank Deposits and ATM Withdrawals Using Stored Value Cards

37. On January 18th, 2006, an HSBC cashier's check payable to D   C   was deposited into an account belonging to Adjei at an ATM located at WSFS' Fox Run Branch (located in Bear, DE). This same ATM was used to deposit a Bank One cashier's check payable to Z    O on February 27th, 2006, and a Bank One cashier's check payable to R    K  on March 3rd, 2006. WSFS determined these checks to be related to Refund Anticipation Loans based on verbiage, which appears to be a RAL agreement, stamped on the back of each check. WSFS reviewed Adjei's account activity and noted multiple wire transfers into his savings account (number 497145860), which reference "Tax Fin Services Fee Payment", "Tax Refund RAL Dept", or "RAL Tax Fee".

7

38. Your affiant confirmed with JP Morgan Chase (Bank One) that it received returns for Z     O  and R     K   from Auskwat Services. Further, JP Morgan Chase confirmed that the cashier's checks payable to O   and K   , and deposited into Adjei's account, represent RALs authorized based on the returns received from Auskwat Services. Your affiant confirmed with HSBC that the cashier's check payable to D     C represents RAL proceeds and that it was released based on a return filed by Auskwat Services. Based on IRS and public records, O , K  , and C    are residents of Wisconsin, although the returns filed by Auskwat Services show a New York or Delaware address for each of them. JP Morgan Chase and HSBC also confirmed that they have made multiple transfers to Adjei's WSFS savings account (number      ) relating to RALs.

39. On March 10th, 2006, your affiant spoke to a WSFS representative regarding conversations he/she had with Adjei. The WSFS representative informed your affiant that WSFS had placed a hold on money in Adjei's account after reviewing his account activity and finding cashier's checks payable to D     C  , Z     O , and R K  . On March 10th, 2006, WSFS notified Adjei of the hold by telephone, and further advised him that it would remain in effect until he submits a written and notarized statement signed by O , K  , and C     stating that Adjei is permitted to negotiate their checks. According to the WSFS representative, Adjei agreed to obtain the statements, however, as of April 10th, 2006, he has not provided WSFS with these statements. Adjei also told the WSFS representative that he and a friend prepare tax returns in New York City for people that he knows. He further explained that he is depositing the checks from O , K  , and C     because he pays his tax return preparation clients their RALs in cash, and in return he keeps their cashier's checks.

40. WSFS records list Adjei's address as             Place, Bear, DE 19701, and his home phone number as (302) 838-    . WSFS records also list Adjei's social security number as     -1277, and his date of birth as          .

41. On April 16, 2004, a business checking account was opened under the name Rydex Ventures at a Commerce Bank branch in New York City. Johnson Agyeman, SSN     -1277, is the authorized signer on the account. Commerce Bank lists Rydex's address as            Avenue, Apt 6G, Bronx, NY 10457. This address also appears on Agyeman's New York Driver's License.

42. Commerce Bank reported that, between February 17th, 2006, and February 21st, 2006, eight cashier's checks were deposited into the Rydex Ventures account using an ATM machine located at a Commerce branch in Bear, DE, and one cashier's check was deposited into the Rydex Ventures account using an ATM located at a Commerce branch off of Limestone Road in DE. These nine cashier's checks range from $2,315 to $2,406 and in aggregate equal $21,290.40. Four of these checks are HSBC checks and the other five are Bank One checks. All are made payable to individuals other than Johnson Agyeman. Your affiant compared the four HSBC cashier's checks obtained from Commerce Bank to a summary of RALs processed by HSBC, and determined that HSBC released these checks based on returns filed

by Auskwat Services. Your affiant also compared the five Bank One cashier's checks obtained from Commerce Bank to a summary of RALs processed by Bank One and found these checks were also processed based on returns filed by Auskwat Services. Your affiant viewed photographs of the aforementioned deposits taken from bank surveillance film, and compared the bank photos to Adjei's Delaware driver's license photograph, to the photograph of Johnson Agyeman provided by the New York Police Department, and to bank photos of deposits made to Adjei's account at Wilmington Trust, and it appears to your affiant that Adjei deposited six of these cashier's checks. The remaining checks were deposited by an unidentified female.

43. Your affiant reviewed Commerce Bank records relating to the Rydex Ventures account at Commerce Bank and found two SBB&T cashier's checks in the amount of $4,372.05 and $5,111.05. The cashier's checks are payable to taxpayers whose information was used by Auskwat Services to file returns with the IRS and SBB&T. Both of these checks were deposited on February 7th, 2006, using an ATM machine located at a Commerce branch in Bear, DE. Your affiant viewed photographs of these deposits as well as photographs of other deposits into the Rydex Ventures account and photographs of deposits into Adjei's account at Wilmington Trust. Based on similarities in appearance, clothing and jewelry worn by the person conducting the transactions in the various photographs, your affiant believes that Adjei also deposited the two SBB&T cashier's checks on February 7th, 2006.

44. Your affiant reviewed Commerce Bank records relating to the Rydex Ventures account and identified five checks, totaling $30,455, drawn on the account, and made payable to Richard Adjei. Four of these checks were deposited into Adjei's account at WSFS. The other check was deposited into a Wilmington Trust account belonging to Adjei. Your affiant viewed photographs taken from Wilmington Trust bank surveillance film, and believes that Richard Adjei is the person photographed depositing the check drawn on the Rydex Venture account into his account at Wilmington Trust.

45. Eight of the aforementioned stored value cards that were issued by HSBC to Auskwat Services for the purpose of making loan payments to taxpayers were used at Wilmington Trust ATM's according to transaction histories provided by HSBC. A special agent involved in this investigation reviewed photographs taken from bank surveillance film supplied by Wilmington Trust which capture transactions involving the use of seven of these cards, as confirmed by HSBC records, and believes they depict Adjei using the ATMs.

### Universal Tax Systems, Inc. (UTS) and America Online (AOL)

46. A UTS representative provided your affiant with the following information relative to EFIN 755160:
    - Name: Auskwat Services;

9

- Address:           Place, Bear, DE 19701;
- Phone #: (917) 250-   ;
- Fax #: (302) 838-   ; and
- Email address: kelvinatorj@aol.com

47. A UTS representative advised your affiant that UTS sells a software package called TaxWise, which enables ERO's to transmit tax return information through UTS to the IRS and financial institutions. According to UTS records, Auskwat Services purchased TaxWise from UTS on November 28th, 2005. UTS shipped the software to          Place, Bear, DE 19701. During his review of Commerce Bank records pertaining to the account of Rydex Ventures, your affiant identified a debit card purchase from UTS on November 28th, 2005.

48. UTS advised your affiant that Auskwat Services was assigned the following IP addresses while accessing the UTS server:
    - 171.161.154.18 on 03/30/2006 at 11:48 PM EST (session continued into 03/31/2006)
    - 172.139.11.69 on 03/27/2006 at 12:15 PM EST
    - 172.163.240.147 on 03/26/2006 at 3:20 AM EST

49. IP addresses that begin in 171 or 172 have been assigned to America Online (AOL). AOL provided records which identify the AOL service subscriber assigned the IP addresses above, on the day and times listed above, as Mike Johnson. The AOL records also indicate that (302) 838-    was the telephone line that the subscriber used to connect to the Internet during the session listed above. The service address of this telephone line is          Place, Bear, DE 19701. Therefore, while connecting to the Internet and accessing the UTS server, the AOL subscriber was physically located at          , Place, Bear, DE 19701. In addition, AOL provided the following subscriber information relating to the account of Mike Johnson:
    - Address:          Avenue, Bronx, NY 10457;
    - Phone Number: (718) 731-   ;
    - Screen Name: kelvinatorj;
    - Credit Card#:          9426; and
    - AOL member since 11/30/2005.

    Avenue is the address which appears on Johnson Agyeman's New York Driver's License. Commerce Bank verified that          9426 is the card number of a debit card linked to the account of Rydex Ventures.

50. Your affiant found checks made payable to          , the community in which Place is located, during a review of Adjei's Wilmington Trust and WSFS checking account records. These checks bear notations indicating that they relate to the rental of          Place. On April 7th, 2006 a representative of Delmarva Power confirmed that power was being provided to          Place, Bear, DE 19701, in the name of Richard Yaw Adjei. Also, on April 7th, 2006, your affiant drove past

10

Place and observed a GEO Prizm with license plate        parked outside. This vehicle is registered to Richard Yaw Adjei.

51. Based on information contained in this affidavit, I have reason to believe that Richard Yaw Adjei used a computer to submit electronically filed false returns from Antlers Place, Bear, DE 19701 to the IRS.

52. Your affiant knows that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about a crime.

53. Based upon the facts set forth above, Richard Yaw Adjei's computer hardware, software, related documentation, passwords, data security devices (as described below), and data were integral tools of this crime and constitute the means of committing it. As such, they are instrumentalities and evidence of the violations designated. Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

(a) Computer Hardware
Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-type binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

(b) Software
Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like tax preparation, word-processing, graphics

11

or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

(c) Documentation
Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

(d) Passwords and Data Security Devices
Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

54. Based upon your affiant's knowledge, training and experience, and consultations with IRS Special Joseph Morales (an agent trained as a computer investigative specialist who has graduated from the Seized Computer Evidence Recovery School in March 1993 at the Federal Law Enforcement Training Center at Glynco, Georgia and from the Computer Investigative Specialist School at the University of North Texas, in July 1995), your affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals, discussed below) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

    a) The volume of evidence. Computer storage devices (like hard disks, and diskettes) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending or the volume of data stored, and it would be impractical to attempt this kind of data search on site, especially at a personal residence.

    b) Technical requirements. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific

procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

55. Based upon your affiant's knowledge, training and experience and upon conversations with S/A Joseph Morales, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

> The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

> If, after inspecting the I/O devices, software, documentation, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them within a reasonable time.

> Data analysts may use several different techniques to search electronic data for evidence or instrumentalities of crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain; "opening" or reading the first few "pages" of selected files to determine their contents; scanning for deleted or hidden data; searching for key words or phrases ("string searches").

## CONCLUSIONS

56. Your affiant believes that Richard Adjei enrolled with the Internal Revenue Service as an ERO for the 2005 tax season for the sole purpose of filing false refund claims with the IRS. All returns submitted to the IRS by Auskwat Services appear to be fraudulent. Adjei used the fraudulent refund claims to obtain refund anticipation loans from HSBC,

13

Bank One, and SBB&T. He then deposited some of the RAL proceeds into bank accounts he controls at WSFS, Wilmington Trust, and Commerce Bank.

57. It is your affiant's believe that Adjei applied to be an ERO using another person's name or had this person obtain an EFIN on his behalf to obscure his responsibility for returns filed by Auskwat Services. However, as Adjei's personal address is the same as Auskwat Services' business address, as mailings of blank checks and stored value cards were sent to Adjei's residence and used to pay RALs, and as Adjei controlled the proceeds of the fraudulently obtained refund loans, it is your affiant's believe that Adjei is filing fraudulent returns under the name Auskwat Services. Further, evidence was obtained from Universal Tax Systems and America Online which show that Auskwat Services was operating from Adjei's residence at           Place, Bear, DE 19701.

58. Adjei wrongfully used the social security numbers of at least 120 taxpayers to prepare and electronically file at least 120 false federal tax returns and claims for refunds from the Internal Revenue Service which total at least $347,145. The evidence gathered to date shows that Adjei filed returns with bogus addresses and return information to generate claims for refunds. He sought to access the refunds by obtaining refund anticipation loans from HSBC Bank, JP Morgan Chase (Bank One), and SBB&T in the form of stored value cards and cashier's checks. HSBC sent stored value cards to Adjei's residence at           Place, Bear, DE 10701. These cards were later used at ATMs in areas where Adjei currently lives (New Castle County Delaware) and lived previously (Bronx, New York). Photographs obtained from bank film show a person believed to be Adjei using ATM machines at Wilmington Trust on dates and at times that correspond to the transaction history of seven stored value cards provided by HSBC.

59. Based on my training and experience and the foregoing facts, your affiant submits that there is probable cause to believe that Richard Yaw Adjei has violated Title 18, United States Code, Section 1344 and Title 18, United States Code, Section 1028A and that the evidence, fruits, and/or instrumentalities of said crimes, as listed on Attachment B, will be found at           Place, Bear, DE 19701.

_____
Special Agent Antonino Lo Piccolo

**Attachment "A"**

**LOCATION TO BE SEARCHED**

   Place, Bear, Delaware, is the first floor of a two-story townhouse in the rental community of ____. The entrance to ____ is marked by a large sign and is off of ____ Circle. ____ Place can only be accessed by car by turning at its intersection with ____ Way. ____ Place dead-ends at both the west and east ends of the road. Parking is off the street, but between the street and the townhouses. Unit 220 is in a row of attached townhouses on the right-side of ____ Place when facing east, and is attached to units 222 on the right and 218 on the left when facing the townhouses. Unit 220 shares a front patio area with 222. This front patio area is covered by a shingled roof. The door to Unit 222 faces the street and is a greenish shade of blue. To the left of this door are two utility meters and a window. Around the window, meters, and doors is faux stonework. Further left (when facing townhouses from the street) and around the edge of the faux stonework is the door to Unit 220. The door to Unit 220 faces east. There is a white wooden post supporting the front patio roof, which is marked towards the top with the number 220 in black. This post is towards the left edge of the front patio. The door to 220 is to the right of the post. A light fixture is mounted to the grayish vinyl siding between the post and the door.

Attachment "B"

# ITEMS TO BE SEIZED

Based on the evidence gathered, together with the experience of IRS-CI Special Agents, there is probable cause to believe that the following evidence of the crimes of bank fraud (18 U.S.C. § 1344) and aggravated identity theft (18 U.S.C. § 1028A), as specified herein, relating to Richard Yaw Adjei, and persons associated with him, may be located on the premises of _____ Place, Bear, Delaware. The items to be seized are the following:

1. Tax records, including retained copies of federal, state, and local tax returns, filed or not filed, and supporting notes, work papers, summary sheets and analyses used in preparation of the tax returns; and tax forms, including Forms W-2; Forms 1099; Forms 1098; and Forms 8633, Application to Participate in the IRS e-file program;

2. Tax preparation software, manuals, purchase records pertaining to software or computer equipment, any and all correspondence with Universal Tax Systems, Inc. or with any other electronic tax return preparation software manufacturer;

3. Bank checks, cashier's checks, including blank check stock, stored value cards, debit cards, bank statements, deposit slips, cancelled checks, credit card records, wire transfers, bank correspondence, money orders, receipts, and safe deposit keys and records;

4. Any and all correspondence or documentation concerning HSBC Bank, JP Morgan Chase (Bank One), Santa Barbara Bank & Trust, and/or any other refund anticipation loan provider;

5. Employment records, payroll records, notes and files containing names, addresses, telephone numbers, individual(s)' identification documents and/or any documents listing social security numbers and/or identifying information;

6. Telephone bills and/or records and Internet service bills and/or records;

7. United States currency;

8. Address books, appointment books, telephone books, rolodex indices, lists, calendars, and any papers reflecting names, addresses, telephone numbers, pagers numbers, fax numbers, e-mail addresses, and web sites of possible financial institutions, and other individuals or businesses with whom a financial relationship exists.

The above paragraphs 1 through 8, inclusive, include all of the foregoing items of evidence in whatever form and by whatever means such materials, their drafts, or their modifications may have been created or stored, including, but not limited to, any handmade form (such as writing); any photocopies; any mechanical form (such as printing, or typing); any electrical, electronic, or magnetic form or data (such as any information on an electronic or magnetic storage device, such as floppy diskettes, hard disks, CD-ROMs, or printer buffers, as well as printouts or readouts from any magnetic storage device).

In addition, computer hardware, software, documentation, passwords, data security devices, and data, as further described below and in the affidavit incorporated by reference into this search warrant, are also to be seized and searched off-site in the matter which is also described, below and in the affidavit incorporated by reference into this search warrant. "Mirroring", "imaging", and/or replication are also authorized.

The items to be seized include any and all electronic devices that are capable of analyzing, creating, displaying, or transmitting electronic or magnetic computer impulses or data. These devices include computers, cell phones, telephones, electronic organizers, personal digital assistants (PDAs), fax machines, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer-related electronic devices.

The items to be seized include any and all instructions or programs stored in the form of electronic or magnetic media that are capable of being interpreted by a computer or related components. The items to be seized include operating systems, application software, utility programs, compilers, interpreters, and other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission.

The items to be seized include any and all written or printed material that provides instructions or examples concerning the operation of a computer system, computer software and/or any related device.

The items to be seized include any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aide of computer-related equipment. This media includes, but is not limited to, floppy disks, diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic code.

Appropriate efforts shall be made to minimize the disclosure of records and other information which are not the subject of this warrant.